UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ABB Inc. : | |
| : | CIVIL NO.: |
| Plaintiff, : | |
| : | |
| vs. : | August 29, 2013 |
| : | |
| UNITED STATES OF AMERICA : | |
| : | |
| Defendant. : | |

# COMPLAINT

ABB Inc. ("ABB" or "Plaintiff"), by and through undersigned counsel, for its Complaint in this action, alleges the following:

## PRELIMINARY STATEMENT

1. ABB brings this civil action against the United States pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, as set forth below, for recovery of response costs incurred and to be incurred by ABB to address the release or threatened release of hazardous substances at property owned by Combustion Engineering, Inc. ("CE") (ABB and CE are both wholly owned subsidiaries of ABB Holdings Inc.) located at 2000 Day Hill Road, Windsor, Connecticut (the "Property" or the "Windsor Site").

2. ABB has incurred, and will continue to incur, necessary costs of response consistent with the CERCLA National Contingency Plan ("NCP"), 40 C.F.R. Part 300, concerning the Windsor Site.

3. The United States has neither contributed to nor reimbursed ABB for any of the response costs incurred by ABB.

4. This civil action also seeks a declaratory judgment under 28 U.S.C. § 2201 and CERCLA § 113(g), 42 U.S.C. § 9613(g), that the United States is liable under CERCLA for past, present, and future response costs at the Windsor Site.

## PARTIES

5. ABB is a Delaware corporation with its principal place of business located at 12040 Regency Parkway, Cary, North Carolina.

6. The United States acted in the matter alleged at various times through the Atomic Energy Commission ("AEC"), the Navy, the Department of Energy ("DOE"), and the Army Corps of Engineers ("ACE").

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 9613(b). The Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 9613(g)(2) authorize this Court to grant declaratory relief.

8. Venue in the district court for the District of Connecticut is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b), because the releases or threatened releases of hazardous substances that give rise to this action occurred or will occur in this district.

9.      The United States has waived sovereign immunity under 42 U.S.C. § 9620(a)(1) with respect to the claims in this action.

## NATURE OF ACTION

10.     ABB brings this civil action pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover response costs incurred and to be incurred by ABB in connection with a facility on which CE conducted contract work for the AEC to support the United States' program to establish and operate the Navy's nuclear-powered surface and submarine fleet.

11.     To discharge its obligations under its contracts with the AEC, it was necessary for CE to work with nuclear materials, including High-Enriched Uranium ("HEU") and Low-Enriched Uranium ("LEU") (collectively, Special Nuclear Material ("SNM")), as well as Depleted Uranium and Natural Uranium (collectively, "Source Material"). As used herein, SNM and Source Material are collectively referred to as "the Materials."

12.     The United States provided the Materials to CE, and at all relevant times the United States held title to the Materials. The United States continues to hold title to the nuclear waste, including residues, generated in the course of CE's work with the Materials under CE's contracts with the AEC at the Windsor facility.

13.     It was also necessary for CE to work with non-nuclear chemicals and other substances at the Windsor facility in order for CE to discharge its obligations under its contracts with the AEC. The AEC held title to materials that were provided by or paid for by the Government to perform the contracts.

- 3 -

14.     The use of the Materials and non-nuclear chemicals at the Windsor facility resulted in the generation of nuclear and chemical waste and residues (collectively referred to herein as "Waste Materials").

15.     The United States, through the AEC and Navy, exercised direct and pervasive control over CE's use and management of the Materials and chemicals at the Windsor facility, including matters involving management and disposal of Waste Materials.  Also under the relevant contracts, the AEC broadly indemnified CE for liabilities and costs associated with, *inter alia*, the effects of the Materials and chemicals.

16.     As a direct result of CE's work for the AEC, the Windsor Site was contaminated with Waste Materials.

17.     The United States has designated the Windsor Site for cleanup under the federal Formerly Utilized Sites Remedial Action Program ("FUSRAP").  FUSRAP was first developed by the AEC under the Atomic Energy Act of 1954, 42 U.S.C. § 2011, *et seq.* ("AEA"), to provide appropriated federal funds to investigate and clean up residual contamination created on sites where nuclear national defense and security activities had been conducted under contracts which indemnified the contractor from harms associated with the work.  Under FUSRAP, the United States has acknowledged responsibility for these remedial activities and is responsible for FUSRAP remedial costs.

18.     With the oversight and approval of the United States, ABB has implemented the necessary response actions to address the Waste Materials at the Windsor Site.  ABB has

expended more than $64 million dollars in response costs for that effort. The United States has reimbursed none of these ABB response costs.

19.     In this action, ABB seeks recovery of the costs incurred for response actions at the Property that are properly the responsibility of the United States for actions related to the AEC contracts, and seeks a declaration that the United States is responsible for such future response costs at the Property.

## FACTS

### *CE's Work for the United States*

20.     CE has owned the Property since 1955.

21.     CE developed the Windsor Site for the specific and exclusive purpose to perform national defense and security-related contract work for the AEC.

22.     The contract work was done at the request of the AEC to support AEC and Navy efforts to establish a nuclear-powered surface and submarine fleet.

23.     Between 1955 and 1959, nine buildings and associated facilities were built on the Property to carry out the AEC contract work.

24.     The first contract between CE and the AEC was signed in July 1955. That contract was for the research, design and manufacture of nuclear fuels for the AEC, and for the operation of a nuclear submarine training facility on a separate parcel within the confines of the Property, known as the "S1C Facility." This also led to the construction of a prototype nuclear test reactor at the S1C Facility. At all relevant times, the United States owned and operated the S1C Facility.

25. Between 1955 and the end of 1961, CE worked on approximately 100 AEC contracts (collectively, the "1955-1961 AEC Contracts") for nuclear research, fabrication of nuclear fuels for the Navy, and construction of the S1C Facility. During this time period, CE conducted research, design, and manufacture of nuclear fuels at the Site exclusively for the United States pursuant to the 1955-1961 AEC Contracts.

26. Title to, and ownership of, all the Materials, including Waste Materials, for the 1955-1961 AEC Contracts were with the United States throughout and following the manufacturing process, and in keeping with the AEA the AEC exercised direct control over the use and handling of the Materials, and the disposal of Waste Materials at the Windsor facility.

27. The first of the 1955-1961 AEC Contracts were similar in consideration. In exchange for the experience CE would gain to facilitate its later entry into the commercial nuclear fuel fabrication market, CE performed the work at cost. CE would make no profit on the work.

28. In order to induce CE to do the work, the United States provided broad indemnities in the 1955-1961 AEC Contracts. These indemnities protected CE against liabilities associated with the work or with using the Materials and chemicals associated with the work. For example, Article XVII of AT (30-3)-198, a 1955 contract, provided that, "the Government shall indemnify and hold the Contractor harmless against loss or damage . . . and any expense in connection therewith . . . arising out of radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or radioactive materials, which the Contractor may use, possesses or otherwise handle under or in connection with this contract . . . ."

29. Pursuant to express language in the 1955-1961 AEC Contracts, the AEC exercised direct supervision and control over all aspects of CE's operations.

30. The AEC's degree of control, direction and supervision of CE's work under the 1955-1961 AEC Contracts was both pervasive and specific. Control measures set out in the 1955-1961 AEC Contracts included the following:

   a. The AEC furnished or approved all design drawings and specifications;

   b. The AEC held title to all material, equipment, supplies and tangible personal property CE purchased to do the contract work;

   c. The AEC retained approval and qualification authority for all processes and procedures;

   d. The AEC set health and safety standards;

   e. The AEC conducted inspections of processing and final products;

   f. The AEC required strict accountability standards for CE's work;

   g. The AEC provided on-site government contract inspectors;

   h. The AEC reserved the right to remove CE employees from the contract work; and

   i. The AEC specifically authorized losses and disposal of the Materials.

31. The AEC did not issue a license to CE to conduct the work. In the absence of such a license, the AEC asserted its control over CE's possession, use, and management of the Materials supplied by the United States directly under its contracting authority. Pursuant to the 1955-1961 AEC Contracts, the AEC exercised pervasive control over the use and management

of the Materials and chemicals at the Windsor facility, as well as disposal of Waste Materials at the Windsor Site.

32. The 1955-1961 AEC Contracts set control and accountability measures for any lost uranium. The AEC anticipated that some portion of the Materials it supplied for fuel fabrication would be lost, either as contamination in the buildings, in the underground waste system, or otherwise released to the environment, and maintained accountability systems to assure that guidelines for such losses were complied with.

33. Work performed under the 1955-1961 AEC Contracts included foundry-type operations, involving the melting, forging, cutting, milling, and grinding of nuclear materials – operations that by their nature generated radioactive waste.

34. As provided for in the 1955-1961 AEC Contracts, the AEC directed and controlled CE's waste management practices and procedures. CE's waste disposal practices were known to the AEC, and in some cases were reviewed and approved by the AEC.

35. The 1955-1961 AEC Contracts specifically provided that title to all property supplied to CE by the AEC, including the Materials, would always remain with the United States. For example, Article VI of Contract AT (30-3)-198 provided, "Title to all property furnished by the Government shall remain in the Government except as otherwise provided in this article. Except as otherwise provided by the Contracting Officer, title to all material, equipment, supplies and tangible personal property of every kind and description purchased by the Contractor, the cost of which is an allowable direct cost under this contract, shall pass directly from the vendor to the Government . . . ."

36. During its ownership and operation of the S1C Facility, the United States discharged hazardous substances, including cobalt-60, into the wastewater treatment system at the Windsor facility, and such hazardous substances were then discharged onto and disposed on the Windsor Site.

### *DOE's Designation of the Windsor Site as a FUSRAP Site*

37. On July 6, 1994, the DOE designated the Windsor Site for inclusion in the FUSRAP. When designated, these non-governmentally owned sites that received and/or processed nuclear materials from the United States become eligible for government-funded cleanup actions.

38. FUSRAP was established to resolve the United States' historic indemnity obligations contained in contracts such as the 1955-1961 AEC Contracts.

39. Inclusion in the FUSRAP program is an acknowledgement that the United States is responsible for cleanup actions at sites where nuclear national defense and security activities were conducted.

40. DOE's original FUSRAP determination for the Windsor Site (June 20, 1994) includes an "Authority Determination" and an "Authority Review," and makes a number of relevant determinations with respect to the FUSRAP designation of the Windsor Site, including:

    a. The HEU used by CE was owned and provided by the AEC;

    b. CE performed its work under contracts with the AEC, but did not receive a license for that work;

      c.      Records of contract activities evidenced broad indemnification by the United States;

      d.      CE was required by contract to obtain AEC approval for disposal and discharges of Waste Materials from contract activities;

      e.      The AEC exercised control over all Materials used at the Windsor facility for work performed under government contract by holding CE accountable for the Materials during fuel fabrication and other manufacturing processes, to include scrap, wastes, and residues; and

      f.      CE disposed/discharged radioactive residues and wastes on-site, and the site was in need of further cleanup.

*<u>ABB's Commercial Licenses and Site Remediation</u>*

41. Following the cessation of the 1955-1961 AEC Contract work, CE conducted nuclear research and development and fuel fabrication work at the Windsor Site under commercial contracts. To possess the nuclear materials necessary to conduct this later work, CE obtained a series of licenses from the AEC, and later the Nuclear Regulatory Commission ("NRC," successor agency to the AEC). At no time following the completion of the 1955-1961 AEC Contract work was CE licensed for production activities involving HEU. All commercial licenses have been terminated with the exception of NRC License No. 06-00217-06, which allows ABB to maintain the nuclear Waste Materials on the Property.

42. In areas of the Windsor Site, the Waste Materials were commingled with radiological materials and production chemicals resulting from CE's later commercial fuel

- 10 -

fabrication work. All radiological materials required cleanup under 10 C.F.R. Part 20, Subpart E, in order for ABB to terminate NRC License No. 06-00217-06 and return the Property to unrestricted use.

43. Pursuant to the Energy and Water Development Appropriations Act for FY1998 (P.L. 105-62), Congress transferred responsibility for the FUSRAP program from DOE to the ACE. Pursuant to the 1999 Energy and Water Development Act (P.L. 105-245), response actions at the Windsor Site are subject to the provisions of CERCLA, including the requirement that response actions comply with the NCP. Under this authority, the ACE continued to investigate and characterize the release and threatened release of hazardous substances at the Windsor Site associated with CE's performance of the 1955-1961 AEC Contracts.

44. In 2007, to ensure a timely and cost-effective cleanup, ABB facilitated an agreement between the ACE and the NRC that allowed ABB, rather than the ACE, to perform the required response actions for the Waste Materials (the "FUSRAP Remedy") under ABB's NRC license with oversight by the NRC and rights of review by the ACE.

45. The FUSRAP Remedy was developed in accordance with the NCP and the NRC's regulations at 10 C.F.R. Part 20, Subpart E. The FUSRAP Remedy was reviewed by the ACE and approved by the NRC in September 2009. Since that time, ABB has performed the response actions and submitted the necessary Final Status Surveys ("FSS") to the NRC. The NRC has performed final confirmatory sampling to ensure that the response actions are complete and the Windsor Site can be designated for unrestricted release at the time of termination of NRC

License No. 06-00217-06.  The ACE has reviewed the FSS and concurred with the NRC's determination.

46.	On November 1, 2010, ABB presented to the United States a demand for response costs incurred and to be incurred by ABB relative to the FUSRAP Remedy.  ABB's submission documented past and estimated future costs totaling more than $85 million.

47.	ABB has substantially completed the response actions at the Windsor Site.  Due to good project management and efficiencies achieved during the cleanup, ABB's actual costs were less than originally estimated.  The total costs incurred by ABB for which it seeks recovery in this action are approximately $64 million.  This figure is within the estimated range of the cost to clean up the Waste Materials at the Windsor Site which the ACE had reported to the Congress in the February 1999 Government Accounting Office Report to the Chairman, Committee on Commerce, House of Representatives.

## COUNT 1

### CERCLA – Cost Recovery

### 42 U.S.C. § 9607(a)

The allegations of paragraphs 1-47 are incorporated as if fully set out.

48.	The United States is a "person" as that term is used in § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21).

49.	ABB is a "person" as that term is used in § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21).

50. The Windsor Site is a "facility" as that term is used in CERCLA § 107(a), 42 U.S.C. § 9607(a), and as defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).

51. HEU, LEU, depleted uranium, natural uranium, and the chemicals used to fulfill the AEC contracts, and cobalt-60 discharged by the Government from S1C, are all hazardous substances under CERCLA § 101(14), 42 U.S.C. § 9601(14).

52. Releases or threatened releases of hazardous substances into the environment have occurred at the Windsor Site within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22).

53. Hazardous substances were "disposed" of at the Windsor Site, within the meaning of CERCLA §§ 101(14), 101(29), and 107(a), 42 U.S.C. §§ 9601(14), (29), and § 9607(a), when the United States was an owner of equipment and materials at the Windsor Site, was an operator of the Windsor Site, arranged for disposal of the Materials, and was the owner and operator of the S1C Facility.

54. In accordance with the NCP, ABB has undertaken, and is currently undertaking, response actions at the Windsor Site under the oversight of the NRC and with the right of review by the ACE, in response to the releases or threatened releases of hazardous substances, and has incurred and will continue to incur necessary costs of response under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

55. The United States is liable under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), as an owner of the equipment and materials that released hazardous substances to the environment or the Windsor Site at the time of such ownership.

56. The United States is also liable under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), as an operator of the Windsor Site at the time hazardous substances were disposed of thereon.

57. The United States is also liable under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), as the owner and operator of the S1C Facility at the time hazardous substances were disposed of at the Windsor Site.

58. The United States is also liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at a facility owned or operated by another party or entity and containing such hazardous substances.

59. The costs that ABB has incurred, and will continue to incur, for response actions to address the release or threatened release of hazardous substances at the Windsor Site, are and will be necessary and consistent with the NCP.

60. Pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), the United States is jointly and severally liable to ABB for reimbursement of ABB's necessary costs of response incurred, and to be incurred by ABB, at the Windsor Site which are consistent with the NCP.

## COUNT 2

**Declaratory Judgment Under CERCLA and the Declaratory Judgment Act**

**42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201**

The allegations of paragraphs 1-60 are incorporated as if fully set out.

62. CERCLA § 113(g)(2) provides that any person may seek a declaration of liability for response costs as defined under CERCLA §§ 101(23)-(25). 42 U.S.C. § 9613(g)(2); 42 U.S.C. §§ 9601(23)-(25).

63. An actual controversy exists between the United States and ABB within the jurisdiction of this Court, and involving the rights and liabilities respecting certain response costs, which controversy may be determined by a judgment pursuant to 28 U.S.C. § 2201. ABB's future costs are neither remote nor speculative.

64. Absent a judicial declaration setting forth the parties' rights, duties, and obligations with respect to such costs, multiple legal actions may result.

65. ABB is entitled to a declaratory judgment pursuant to CERCLA § 113(g)(2) that requires the United States to reimburse ABB for all necessary response costs to be incurred by ABB in the future in connection with the Windsor Site.

66. Copies of this Complaint will be provided to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency, in accordance with the requirements of CERCLA § 113(l), 42 U.S.C. § 9613(l).

**PRAYER FOR RELIEF**

WHEREFORE, ABB respectfully requests judgment in its favor:

    A.    Judgment in favor of ABB and against the United States requiring the United States, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), to pay

the costs of response incurred, or to be incurred, by ABB at the Windsor Site, together with interest and costs of this action.

B. Declaratory Judgment pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, which will be binding in any subsequent action or actions that ABB may bring to recover response costs against the United States, that the United States is liable for response costs that ABB may incur in the investigation and cleanup of environmental contamination at the Windsor Site;

C. Pre-judgment interest on the response costs incurred by ABB; and

D. Such other and further relief as the Court may deem proper.

Dated: August 29, 2013

Respectfully submitted,

*/s/ Peter R. Knight*
Peter R. Knight (ct17839)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT  06103
Phone:  860-275-8387
Fax:  860-275-8299
*pknight@rc.com*

James A. Thompson, Jr. (ct01459)
PEPPER HAMILTON LLP
600 14th Street, NW
Washington, DC  20005
Phone:  202-220-1635
Fax:  202-220-1665
*thompsja@pepperlaw.com*

        David T. Buente *(pro hac vice motion to be filed)*
        Samuel I. Gutter *(pro hac vice motion to be filed)*
        SIDLEY AUSTIN LLP
        1501 K Street, NW
        Washington, DC  20005
        Phone:  202-736-8111
        Fax:  202-736-8711
        *dbuente@sidley.com*
        *sgutter@sidley.com*

        ATTORNEYS FOR THE PLAINTIFF, ABB INC.

Of Counsel:

E. Barry Lyon
Vice President, Assistant General Counsel
ABB Inc.
187 Danbury Road
Wilton, CT  06897